UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:14-cr-00079-KJD-PAL |
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| BRYON QUACKENBUSH, | (Mot. Suppress – Dkt. #45) |
| Defendant. | |

Before the court is Defendant Bryon Quackenbush's Motion to Suppress (Dkt. #45) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the Motion, the government's Response (Dkt. #50), and evidence taken at an evidentiary hearing conducted September 1, 2015[1]. Brett Whipple appeared on behalf of the Defendant, and Allison Herr on behalf of the government.

## BACKGROUND

The Defendant, Bryon Quackenbush ("Quackenbush") is charged in an indictment filed March 5, 2014, with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). The indictment arises out of a federal arrest warrant for Riley "Blake" Lively executed at an apartment on 3001 Lakes Dr., #220, in Las Vegas, Nevada on February 20, 2014.[2] Quackenbush

---

[1] An evidentiary hearing was originally scheduled for July 27, 2015, however, the parties stipulated to continue the hearing based on the unavailability of a critical witness who was on military duty and not available until after the week of August 10, 2015.

[2] The motion repeatedly refers to a search warrant. However, the 302 attached as Exhibit A to the motion and testimony of FBI Special Agent Bugni make it clear that officers initially went to the apartment to arrest Lively on an arrest warrant. Quackenbush was questioned after Lively was removed. After Quackenbush made incriminating statements, Bugni called an AUSA and the decision was made to arrest Quackenbush and obtain a federal search warrant based on Quackenbush's admissions.

and his roommate, Lively, were in the apartment at the time officers gained access.  Lively was placed under immediate arrest.  According to the motion, during the next two hours, federal agents questioned Quackenbush who made incriminating statements that he was attracted to children and had received child pornography from Robert Norwood consisting of pictures of Norwood's younger brothers' genitals and media of Norwood and his brothers engaged in oral sex.  Quackenbush allegedly admitted that he and Norwood exchanged pictures and descriptions of Norwood's sexual activities with his eight and eleven-year-old brothers and made other admissions prior to *Miranda* warnings.

## I.      The Parties' Positions.

In the current motion Quackenbush seeks to suppress his statements arguing they were taken in violation of his Fifth and Fourteenth Amendment Rights.  Quackenbush maintains that he was subjected to custodial interrogation before *Miranda* warnings were administered.  Additionally, he argues that the government cannot meet its burden of proving by a preponderance of the evidence that his statements were voluntary.  The circumstances of this case indicate that government conduct made it impossible for Quackenbush to make a rational choice about whether or not to confess.  Quackenbush was in custody at the time he made his statements, the interrogation occurred inside his living room, and officers had focused their investigation on him.  All indicia of an arrest were present.  The length and form of the questioning demonstrate he was subjected to custodial interrogation and the questions were interrogatory in nature.

The government opposes the motion arguing Quackenbush was not subjected to custodial interrogation, and therefore, *Miranda* warnings were not required.  The government's written opposition asserted the agent who questioned Quackenbush "is believed to have erred on the side of caution and advised Quackenbush of the *Miranda* warnings."  However, the government argues that, even if the court finds Quackenbush was not advised of *Miranda* warnings, his incriminating statements are still admissible because he was not subjected to custodial interrogation as a matter of law, which means "express questioning or its functional equivalent."  In this case, the government asserts that Quackenbush was only handcuffed for a few minutes

and only as long as necessary to address safety during the execution of the arrest warrant for Lively. Quackenbush was not handcuffed at the time of questioning. He was in his own home in a comfortable environment with only two officers in his immediate vicinity. He was aware of why the officers were present, told he was not under arrest, and did not have to speak with them. He was not tricked or coerced. Rather, the agents told Quackenbush about the warrant for his roommate's arrest, and advised him of the nature of the investigation.

Agents on the scene asked Quackenbush for consent to preview the computers and explained what they were looking for. According to the agents' reports, Quackenbush voluntarily offered information.

## II.   Testimony at the Evidentiary Hearing.

The government called Special Agent Nicholas Bugni and rested. After the government rested, counsel for Quackenbush requested an opportunity to confer with his client and the court took a short recess. Following the recess, counsel and Mr. Quackenbush indicated Quackenbush had decided to testify. The court canvassed Quackenbush concerning his understanding of his right to testify, and his right not to testify. Quackenbush acknowledged that he had discussed the matter with his counsel, and that it was his decision after conferring with counsel to testify.

### A.   Testimony of Special Agent Bugni.

Bugni is employed by the FBI and has been involved in law enforcement for approximately eight-and-a-half years. He is currently assigned to the Child Exploitation Task Force. On February 20, 2014, he was involved in the arrest of Lively in Las Vegas. He had no involvement in the investigation that led up to the arrest warrant. The warrant was referred to the Las Vegas FBI as a result from a lead from Detroit. The investigation involved a Robert Norwood. Bugni knew a little bit about the Detroit investigation and was given brief facts about Norwood. The arrest warrant for Lively was issued out of Michigan. The information he had about Quackenbush was that it was believed Quackenbush had traveled to Detroit, Michigan with Lively and Norwood, and that Quackenbush had been involved in an incident involving a juvenile while there.

Bugni was part of the arrest team for Lively which consisted of eight agents. Agents went to their apartment, a second story two-bedroom apartment in a fairly large apartment complex. Bugni's primary role was to serve on the arrest team, and his secondary role was to interview Quackenbush after Lively's arrest. It was presumed Quackenbush and Lively lived together based on information received from Detroit.

This was a low key arrest warrant because there was no indication that either of the roommates were a high risk. In these circumstances, officers try to minimize the law enforcement exposure in a high density apartment area to minimize risk, keep people safe and therefore carry minimal weapons. The officers who knocked on the door wore button-down shirts and jeans or khakis. They wore concealing garments over their weapons. Bugni believed the officers who approached the door used a repairman ruse. To his recollection, no weapons were drawn during any point in the encounter. After a brief conversation at the door confirmed that Lively was present, the arrest warrant was executed.

Bugni remained at the bottom of the stairwell on the first floor while three officers went up to the second floor landing. One officer acted as cover and two went to the door. Both Quackenbush and Lively were temporarily detained while the residence was secured. Quackenbush's temporary detention was for officer safety until the "safety clear" of the apartment was conducted. Typically, suspects are told to stand until the safety check is finished. A safety check consists of looking for other people in the apartment and anything that would hurt officers such as weapons or knives. He estimated it took less than three to five minutes to complete the safety check. Lively was positively identified and given an opportunity to dress, get his identification and then transported to jail by Special Agents Castillo and Flaherty. Four officers stayed behind after Lively was taken to jail. Quackenbush was taken out of handcuffs immediately after the safety check was completed. Officers reentered the apartment and stayed in the family room/dining room area. Three agents were inside and one was outside the door.

Bugni described his own demeanor as monotone. By the time officers reentered the apartment, everything had deescalated. Bugni explained officers were at the apartment to arrest Lively and asked Quackenbush if he was willing to answer questions. There was no shouting,

raised voices, or weapons drawn during the encounter.  Quackenbush was told he could leave after Bugni explained why officers were there, and asked if he was willing to answer questions.  Bugni sat down in the dining room area.  He believed he pulled a milk carton or something else to sit on so that he was not standing over Quackenbush while talking to him.  Quackenbush was told he was not under arrest or in custody and he was free to leave.  He was also told that if he did not want to answer any questions, Bugni's feelings would not be hurt.  The other two officers were in the family room/dining room area.  One was approximately five feet away and the other was approximately ten feet away.

Bugni told Quackenbush what the point of the interview was, and the types of questions Michigan wanted answered.  Specifically, Quackenbush's involvement, if any, with Lively in the April 2009 trip to Michigan.  Other than this, Bugni had no other facts at that time about the Michigan investigation involving Norwood or Lively.  From Bugni's perspective, the point of the interview was to indicate whether Quackenbush was involved with Lively.  Bugni had not opened an investigation of Quackenbush.

Bugni told Quackenbush that Lively was arrested for a child exploitation investigation out of the state of Michigan.  Bugni initially tried to establish rapport with Quackenbush by asking questions about how long he had known Lively, what he did for a living and what his relationship with Lively was.  Quackenbush said that he and Lively worked from home for AT&T. This explained the amount of computers and computer equipment in the apartment.

Bugni asked Quackenbush whether he had traveled to Michigan.  Quackenbush initially denied it.  Bugni told Quackenbush he was aware of a specific incident involving Quackenbush's encounter with a law enforcement officer and a young juvenile in April 2009 in Michigan.  Quackenbush responded "Oh, you know about that."  After this, Quackenbush became more forthcoming and answered questions in a little more detail.  Quackenbush admitted Norwood sent him child pornography and gave information to Bugni which led to probable cause for a potential search warrant.  Quackenbush was cooperative by showing Bugni a computer on which he received child pornography.  The computer Quackenbush showed Bugni was in a closet and

1    not plugged in.  Quackenbush pulled it out of his closet and identified it as the one on which

2    Norwood sent him child pornography.

3        After refreshing his recollection from his 302, Bugni recalled that Quackenbush said he

4    and Norwood met online in a chat room and continued conversation via Yahoo Messenger.

5    Bugni did not administer *Miranda* warnings to Quackenbush because Quackenbush was not

6    under arrest.  Bugni's process was to get information regarding Quackenbush's relationship to

7    Lively.  During the interview Quackenbush also said he was present during a sexual encounter

8    between Lively and Norwood's younger brothers.  Once Quackenbush admitted to contraband

9    being sent, officers decided there was probable cause for a search warrant and conferred with the

10   U.S. Attorney's Office.

11       After speaking with the U.S. Attorney's Office, Bugni was told Quackenbush could be

12   arrested for aiding and abetting, and the decision was made to arrest Quackenbush on probable

13   cause for aiding and abetting the Michigan crime.

14       The arrest warrant for Lively was served at approximately 9:00 a.m. on February 20,

15   2014.  Quackenbush was transported to the Henderson Detention Center by 11:00 a.m. to 11:30

16   a.m., indicating officers were at the scene approximately 2 to 2 ½ hours.  Bugni estimated that

17   his interview of Quackenbush took "probably an hour, give or take."  At no time during the

18   interview did Quackenbush ask the officers to leave, get agitated or upset, or refuse to answer

19   questions.  Bugni described Quackenbush as very cooperative.  The interview was not tape

20   recorded as this was not standard FBI operating procedure at the time.  That policy has now

21   changed.  It was also not standard FBI operating procedure to administer *Miranda* warnings

22   because Quackenbush was not in custody and Bugni was not conducting a custodial interview.

23       On cross-examination, Bugni reiterated that he did not provide *Miranda* warnings or see

24   anyone else administer Quackenbush *Miranda* warnings while officers were in the apartment.

25   Bugni remained at the bottom of the stairwell with other officers while the three officers initially

26   approached the door to the apartment.  Bugni could not overhear the conversation of the officers

27   who knocked on the door.  Bugni was aware the officers who knocked were going to use some

28

6

1    type of ruse.  He thought it was some time of a maintenance ruse, such as a water leak, but he

2    was not there and did not really know.

3           At the threshold of the door, both Lively and Quackenbush were placed in temporary

4    custody while a safety clear was done.  He estimated that Quackenbush's handcuffs were

5    removed after three-to-five minutes.   Lively was able to gather clothes or shoes and

6    identification before he was transported to jail.  Bugni entered the apartment just briefly as part

7    of the safety clear.  He did not recall observing Quackenbush in cuffs.

8           Before entering the apartment to serve the arrest warrant, Bugni had been briefed about

9    the Michigan investigation.  He was told that Lively and Quackenbush had traveled to Michigan

10   in April 2009.  Detroit believed Quackenbush was with Lively on the trip.  An officer's report

11   indicated Quackenbush had been stopped with a juvenile boy in Michigan.

12          Bugni could not recall the exact charge on the arrest warrant for Lively.  He believed it

13   had something to do with child pornography.   Bugni asked Quackenbush questions about

14   traveling to Michigan for child pornography purposes because the interview led there, but it was

15   not his initial purpose in interviewing Quackenbush when he first began questioning him.

16          Bugni did not recall if Quackenbush was uncuffed before Lively was taken out of the

17   apartment, but testified that cuffs were removed immediately after the safety sweep was

18   completed.  Bugni did not begin questioning Quackenbush until after Lively was removed.  He

19   told Quackenbush that the purpose of officers being there was to arrest Lively.  He reiterated that

20   the purpose of the officers being at the apartment was to arrest Lively, and his secondary purpose

21   was to interview Quackenbush.  Bugni first asked Quackenbush background questions such as

22   where he lived and worked, then asked about the computers and trip to Michigan.  After Bugni

23   realized Quackenbush was not being honest about traveling to Michigan, he confronted

24   Quackenbush with his encounter with law enforcement.   He estimated this was towards the

25   middle of the interview.

26          Bugni did not give *Miranda* warnings to Quackenbush because Quackenbush was still

27   not in custody.  Bugni denied that he told Quackenbush his status would depend on how he

28   answered questions.   Bugni could not recall asking Quackenbush about a boy in the

7

neighborhood named Tim or Timothy who might be in danger or telling Quackenbush that he had a choice to make. Bugni's 302 did not make any reference to a Tim or Timothy, and he did not recall any such conversation. He understood from Agent Flaherty that there was someone in the neighborhood, but this was not something Bugni was asked to clarify with Quackenbush. Bugni denied that he told Quackenbush that if Quackenbush chose to say nothing, they would take him to jail. Bugni denied that he told Quackenbush that his answers could help to prevent his arrest. Bugni did not recall whether Quackenbush asked if he was going to be arrested. At the beginning of the interview, it was explained to Quackenbush why Bugni and other officers were there—to arrest Lively. Bugni denied that officers used fake wanted posters as a ruse at the door. Bugni did not ask Quackenbush for consent to search the computer. He did not recall if anyone else did so. Quackenbush showed Bugni a computer. The computer that Quackenbush showed Bugni was left in the hall until a search warrant was obtained, at which time it was seized and searched. Bugni walked with Quackenbush to retrieve the computer in a back hallway. Bugni could not recall where the other two officers inside the apartment were. He is sure they moved around during the hour they were in the apartment while Bugni was asking Quackenbush questions.

Bugni acknowledged that the answers to questions he asked Quackenbush were used to obtain the search warrant. The information he received from Quackenbush also provided probable cause for Quackenbush's arrest. Quackenbush never asked if he could leave, but was told he was free to leave. Bugni did not indicate to Quackenbush that he was going to be placed in custody or tell him the consequences of lying. Bugni denied that he told Quackenbush that if Quackenbush talked to him, he would let Quackenbush go. Bugni testified that would make no sense because Quackenbush was free to leave at any time. Bugni had no intention of placing Quackenbush in custody that day. Bugni was not aware until after talking with the AUSA that Quackenbush could be arrested for aiding and abetting the Michigan crime. As Bugni talked with Quackenbush, he developed probable cause to believe child pornography was on the computer. Once Quackenbush admitted to being present in a room as sex acts were occurring "that raised a whole different concern" about Quackenbush's danger to the community.

1  Quackenbush was not taken into custody that day until after the interview was completed and
2  after Bugni had called AUSA Christina Silva.

3       **B.  Testimony of Bryon Quackenbush.**

4       Quackenbush testified that on the morning of February 20, 2014, he was taken into
5  custody and arrested at the end of the interview with Agent Bugni.  He recalled answering the
6  door when the officers knocked.  He was not immediately handcuffed.  He was handcuffed after
7  officers showed him the wanted posters and they confirmed that Lively was in the apartment.
8  The wanted posters consisted of a sheet of paper with two adults on them—a female and a male.
9  Officers asked if Quackenbush knew anything about them.  Lively was just getting up and
10 Quackenbush called him to the door.  Lively looked at them after Quackenbush asked him if he
11 knew these people.  Both he and Lively were then handcuffed and secured while the safety
12 sweep was done.  After that, Quackenbush was taken to the kitchen.  At some point, the
13 handcuffs were taken off.  Quackenbush did not feel he was free to leave.  He was led by the arm
14 by an agent to the front room.  A second agent was at the door.  At no time did he feel free to
15 leave the apartment.  He sat in an office chair because he was told to sit there.  He was facing
16 towards the kitchen and towards the three agents who were between Quackenbush and the
17 hallway.  At one point, Quackenbush tried or started to get up.  He noticed one of the officers
18 tensing up which suggested, by the officer's body language, that he should not get up, so he sat
19 back down.

20      Quackenbush was not told he was under arrest until the end of the questioning.  Other
21 officers besides Bugni questioned him.  Three officers were present observing.  Quackenbush did
22 not recall whether all of the officers asked questions.  He believed so but did not "want to go on
23 the record saying they did."   He was questioned about a Timothy or Tim, a child in his
24 neighborhood who may be in danger.   Once he was placed in the front room, Quackenbush was
25 told he was not under arrest.  However, he was told how long that remained true depended on
26 him.  He was told he had two choices: one, remain silent and follow his roommate to jail; or two,
27 assist the officers in answering questions about Tim or Timothy.  He was told he could be
28 arrested, lose his job and everything in his apartment.

On cross-examination, Quackenbush testified that three officers were in the apartment during the interview. The officers were three adult white males. Quackenbush testified his vision was not that good because his eyes were partially paralyzed at birth and his resolution was reduced so he sees fewer sharp details. The officers were wearing street clothes and he estimated they were in their mid-20s. Quackenbush was never told he could freely leave, but was told he had the option of remaining silent and which point he could go to jail.

### DISCUSSION

**I.     Requirement for *Miranda* Warnings.**

The government's written opposition to the motion to suppress argued that *Miranda* warnings were not required because Quackenbush was not subjected to custodial interrogation. However, government counsel believed that one of the officers administered *Miranda* warnings "out of an abundance of caution." At the conclusion of Special Agent Bugni's testimony, government counsel indicated she obtained her understanding that *Miranda* warnings were possibly given from another agent while Bugni was unavailable on military leave. The government therefore withdrew its assertion that *Miranda* warnings were given.

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *See Thompson v. Keohane*, 516 U.S. 99, 102 (1995). In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. at 300-01. If *Miranda* warnings are required, the government must establish, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

The Supreme Court and courts of appeal have repeatedly emphasized that many types of questions are not considered interrogation and do not require *Miranda* warnings. For example, questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Asking a suspect questions regarding general biographical information is not interrogation. *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

10

1    After Bugni testified, the government conceded that *Miranda* warnings were not given to

2    Quackenbush.   The court must therefore determine whether Quackenbush was subjected to

3    custodial interrogation.

4    **II.   Custodial Interrogation.**

5    *Miranda v. Arizona* held that pre-interrogation warnings are required when a suspect in

6    custody is interrogated because of "the compulsion inherent in custodial surroundings."   384

7    U.S. at 458.   The *Miranda* decision defined "custodial interrogation" as "questioning initiated by

8    law enforcement officers after a person has been taken into custody, or otherwise deprived of his

9    freedom of action in any significant way."   *Id.* at 444.   Whether a person is in custody for

10   purposes of the requirement to administer *Miranda* warnings is determined by examining the

11   objective circumstances of the interrogation.   *Stansbury v. California*, 511 U.S. 318, 322 (1994)

12   (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).   The *Stansbury* court explained that

13   "the initial determination of custody depends on the objective circumstances of the interrogation,

14   not on the subjective views harbored by either the interrogating officers or the person being

15   questioned."   *Id.* at 323.

16   Courts determining whether a person has been subject to custodial interrogation must

17   examine "all of the circumstances surrounding the interrogation" and determine "how a

18   reasonable person in the position of the individual being questioned would gauge the breadth of

19   his or her freedom of action."   *Id.* at 322, 325.   (Internal quotation marks and alteration omitted."

20   In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Supreme Court described the two inquiries

21   lower courts must make to determine whether a suspect is in custody for purposes of the

22   necessity to administer *Miranda* warnings.   First, courts should examine the circumstances

23   surrounding the interrogation.   516 U.S. at 112.   Second, the court must examine whether, under

24   the circumstances surrounding the interrogation, a reasonable person would have felt he or she

25   was not at liberty to terminate the interrogation and leave.   *Id.*   The court emphasized this is an

26   objective test and the ultimate inquiry is whether there was a formal arrest or "restraint on

27   freedom of movement to the degree associated with a formal arrest."   *Id.* at 112.   (Internal

28   quotation marks and footnote omitted.)

The Supreme Court has not mandated consideration of any particular circumstances in the custodial interrogation inquiry. Rather, courts are required to "examine all of circumstances surrounding the interrogation" *Stansbury*, 511 U.S. at 322, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave." *Id.* at 325. In *Yarborough v. Alvarado*, 541 U.S. 652, 667, the Supreme Court explained that the objective custody is "designed to give clear guidance to the police" and does not involve examining the "actual mindset" of the particular suspect subjected to police questioning. The Supreme Court has recognized that any police interview of an individual suspected of a crime has "coercive aspects to it." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1997) (*per curiam*). However, by examining the objective circumstances of the interrogation, and inquiring how a reasonable person in the suspect's position would understand his or her freedom to terminate questioning and leave, the objective test "avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and defining how those particular traits affect each person's subjective state of mind." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011).

In the Ninth Circuit, the issue of whether a Defendant was subjected to custodial interrogation is a mixed question of law and fact which is reviewed *de novo*. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). The district court's factual findings are reviewed for clear error. *Id.*

The Ninth Circuit has held that a defendant is in custody if a "reasonable innocent person in such circumstances would conclude that after brief questioning, he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1991). The Ninth Circuit has identified five on exclusive factors relevant to the custody determination. These include: (1) the language used to summon the individual; (2) the extent to which the individual is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *Id.* at 974. These factors are illustrative and not exhaustive. *Id.* The court's ultimate decision is whether a

reasonable innocent person would have believed he or she could freely walk away from interrogating officers. *Id.*

Here, three officers knocked on the door of the apartment Quackenbush shared with Lively employing a ruse of some sort to determine if Lively was in the apartment.  It is undisputed that Quackenbush answered the door and called Lively to the door.  Once officers at the door confirmed Lively was in the apartment, the officers entered the apartment, handcuffed both Quackenbush and Lively, and conducted a safety sweep of the apartment.  Bugni estimated it took three to five minutes to conduct the safety sweep after which Quackenbush was uncuffed. Lively was positively identified and given an opportunity to obtain his clothing and identification and transported to jail by two of the officers.  Three of the officers stayed behind and reentered the apartment remaining in the family room and dining room area while a fourth agent remained outside the door.

Bugni explained to Quackenbush why the officers were there and asked Quackenbush if he was willing to answer questions.  Bugni testified he sat down in the dining room area, pulling a milk carton or something else to sit on so that he was not hovering over Quackenbush while talking to him.  Quackenbush testified that he was not immediately handcuffed when the officers knocked on the door.  He was only handcuffed after officers showed him wanted posters and confirmed Lively was in the apartment.  At that point, both he and Lively were handcuffed while the safety sweep was completed.  Quackenbush testified that the handcuffs were taken off "at some point" and he was led by the arm by an agent to the front room while another agent was at the door.  He was told to sit in an office chair and was facing towards the kitchen and towards the three agents who were nearby.  The court found Quackenbush credible in this regard. Although Quackenbush was not ordered to sit in a chair, he was led by the arm from the kitchen to the family room/dining room area and directed to sit in the chair.  The first *Kim* factor weighs in favor of finding that Quackenbush was in custody.

Examining the second *Kim* factor, the extent to which the defendant was confronted with evidence of guilt, the court finds that this factor weighs against finding the interview was a custodial interrogation.  Quackenbush was not confronted with evidence that he engaged in any

criminal activity.  In fact, Bugni knew very little about the Detroit investigation resulting in the arrest warrant for Lively.  The only facts about the Detroit investigation that Bugni had relevant to Quackenbush was that Detroit investigators believed Quackenbush had traveled to Michigan in 2009 with Lively, and had been involved in law enforcement contact as a result of an incident with a juvenile.  Bugni acknowledged that when Quackenbush denied he had traveled to Michigan with Lively in 2009, he confronted Quackenbush with his law enforcement contact in Michigan related to the juvenile.  According to Bugni, after he did so, Quackenbush responded "oh, you know about that" and became more forthcoming and answered questions in more detail. After Bugni confronted Quackenbush with his knowledge about contact with a police officer in Michigan where he was caught with a juvenile boy in the woods, Quackenbush began to answer questions admitting he and Lively traveled to Michigan and had contact with a person named Robert.  However, Quackenbush does not claim that he was accused of any criminal misconduct involving the night he was caught in the woods with the juvenile, only that the incident was documented.  Quackenbush does not claim that he was confronted with any other evidence of criminal misconduct during the interview. Quackenbush went on to make a series of incriminating admissions that ultimately resulted in his arrest and an application for a search warrant for the apartment.

The Ninth Circuit has found a defendant in custody when the interrogator adopts an aggressive coercive and deceptive tone. *United States v. Bassignani*, 573 F.3d 879, 994 (9th Cir. 2009).  Here, the court found Bugni credible when he described his demeanor in approaching Quackenbush as "monotone."  The court also found Bugni credible that there was no shouting or raised voices, that Bugni asked Quackenbush if he was willing to answer questions, and Quackenbush agreed.  Quackenbush did not dispute this testimony in his own testimony. The court also found Bugni credible that his initial questions were low key background questions intended to build rapport, the entire interview lasted approximately one hour, and Bugni told Quackenbush he could leave and was not under arrest.  Quackenbush does not dispute Bugni's testimony that no weapons were drawn at any point during the encounter.

The third *Kim* factor, the physical surroundings of the interview, weighs in favor of finding the interview was not a custodial interrogation.  It was conducted in the familiar surroundings of Quackenbush's apartment.  There was no testimony that Quackenbush ever requested to leave, or that his movements were restricted.  At most, Quackenbush testified that he was initially led by the arm from the kitchen to the living room and directed to sit in a chair, and that at one point, he tried or started to get up and sensed one of the officers tensing which caused him to sit down.  His testimony did not specify whether he actually stood up, tried to stand up, or what type of movement he made that resulted in one of the officers "tensing."  He did not describe what he meant in any further detail.  He does not claim that Bugni was the officer who "tensed," or that any officer instructed him to remain seated or physically restricted his movements.

 Quackenbush did not dispute that at one point during the interview, he told Bugni about receiving child pornography from Norwood and offered to retrieve the computer from another room.  Bugni testified that he accompanied Quackenbush to the hallway where Quackenbush retrieved the computer and showed it to Bugni.  Quackenbush does not claim that he asked to get up at any point during the interview, or that any of the three officers inside the apartment restricted his movements.

Bugni testified that his primary purpose that day was to arrest Lively on the warrant, and his secondary role was to interview Quackenbush about his involvement, if any, with Lively, in the April 2009, trip to Michigan.  Bugni knew little about the Michigan investigation, had not opened up an investigation of Quackenbush, and only asked follow up questions suggested by Quackenbush's answers.  Bugni did not have a warrant for Quackenbush's arrest, and had no plans to arrest Quackenbush until after the conclusion of the interview when he conferred with AUSA Silva and was told Quackenbush could be arrested on probable cause for aiding and abetting the Michigan crime based on his admissions.  Quackenbush himself testified that he was not told he was under arrest until after the end of the interview.

Turning to the fourth *Kim* factor, the duration of the detention, Quackenbush was only briefly detained for three to five minutes after arresting agents confirmed Lively was in the

apartment, entered to arrest Lively, and conducted a safety sweep of the apartment. Quackenbush was expressly told that he was not under arrest and told he was free to leave. Quackenbush admitted in his testimony that he was told he was not under arrest at the beginning of the interview, and was not told that he was under arrest until the end of the interview.

Finally, the fifth *Kim* factor, the degree of pressure used during the interview, weighs in favor of finding Quackenbush was not in custody. Although Quackenbush testified he was told he was not under arrest, he also testified he did not feel free to leave and was never told he could "freely leave." Quackenbush also testified that he was told he had two choices. He could remain silent and go to jail like his roommate, or assist officers by answering questions about a Tim or Timothy. Bugni denied that the told Quackenbush that he had these two choices or that Quackenbush's status depended on how he answered questions. Bugni also denied asking Quackenbush about a boy in the neighborhood named Tim or Timothy who might be in danger and telling Quackenbush that he had a choice to make. The court found Bugni credible in this regard. Bugni had some recollection that Agent Flaherty had information about a juvenile in the neighborhood but he did not recall asking Quackenbush about it and his 302 makes no reference to such a line of questioning.

The court found Quackenbush credible that he did not subjectively feel he was free to leave. However, the Supreme Court has made it clear that the court must apply an objective test and determine how a reasonable innocent person in Quackenbush's position would perceive his or her freedom to leave. Quackenbush's subjective state of mind is not relevant to the court's objective determination of whether a reasonable person in Quackenbush's position would perceive his freedom to leave the apartment or terminate questioning.

The Ninth Circuit has consistently held that perhaps the most significant factor for the court to consider in resolving the question of custody is whether the defendant was expressly told that he was not under arrest. *See United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2003); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). Quackenbush admits he was. The Supreme Court has repeatedly emphasized that the determination of whether a person is in custody for purposes of the requirement to administer *Miranda* warnings depends on the

objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.  Quackenbush was asked whether he was willing to answer questions and agreed.  The interview took place in Quackenbush's own apartment.  Although Quackenbush was directed to sit in a chair, Quackenbush does not claim that he was told to remain seated, claim that he asked to get up at any point other than to retrieve the computer from the hallway, or that his movements were restricted during the interview.

Quackenbush was not confronted with evidence of his guilt of any crime.  At most, he was confronted with lying about whether he traveled to Michigan with Lively in 2009.  Bugni did not know enough about the Michigan investigation to confront Quackenbush with evidence of guilt in the Michigan investigation.  Rather, Bugni asked follow up questions suggested by Quackenbush's admissions. The interview took place in the familiar surroundings of his own living room/dining room area. The court found Bugni credible that the overall tenor of the interview was low key.  Quackenbush was asked preliminary questions about how long he had lived in Las Vegas, how long he had known Lively, where he worked, and similar background questions before being confronted with lying about traveling to Michigan with Lively in 2009.

In short, the court finds under a totality of the circumstances that Quackenbush was not subjected to a restraint of his movements to a degree associated with formal arrest such that a reasonable innocent person in his circumstances would conclude that he was not free to leave or terminate the encounter.  The court therefore finds the interview was not a custodial interrogation for which *Miranda* warnings were required.

## III.    Voluntariness.

The government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).

A statement is voluntary where it is "the product of a rational intellect and free will." *See United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (*citing Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)).   In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution."

*See Derrick*, 924 F.2d at 817.  In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See Connelly*, 479 U.S. at 167.  It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence.  *See United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Connelly*, 479 U.S. at 168.

To determine whether a confession is voluntary, the court applies a totality of the circumstances test.  *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne."  *Id*.  In assessing the voluntariness of a confession, the court considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  *Gifferson v. United States*, 530 U.S. 428, 434 (2000).

Here, Quackenbush claims that he was coerced into making incriminating statements by statements Bugni made that he had two choices-- essentially either cooperate and answer questions, or go to jail like his roommate.  The court found Bugni credible that he did not make these threatening or coercive statements.  Bugni had no evidence to confront Quackenbush about involving Lively's crimes, and knew little about the Michigan investigation.   Quackenbush recalled being questioned about a boy in the neighborhood named Tim or Timothy who may be in danger.  Bugni recalled something about Special Agent Flaherty's concern about a juvenile in the neighborhood, but did not recall questioning Quackenbush about this subject at all.  Flaherty is one of the two agents who left the apartment to transport Lively to jail.  Bugni's 302 contains a detailed account of the subject matter areas on which Quackenbush was questioned, and the incriminating responses he gave, but contains no reference to questioning about a Tim or Timothy.

Considering the totality of the circumstances, the court finds the government has met its burden of showing by a preponderance of the evidence that Quackenbush's statements were voluntary and not the product of physical or psychological coercion which overcame his will.

1

## **CONCLUSION**

2      Examining the totality of the circumstances and applying the objective test mandated by

3  the Supreme Court, the court finds that Quackenbush was not subjected to custodial

4  interrogation. *Miranda* warnings were therefore not required.   The court also finds the

5  government has met its burden of establishing that Quackenbush's statements to Bugni were

6  voluntary.

7      For these reasons,

8      **IT IS RECOMMENDED** that Quackenbush's Motion to Suppress (Dkt. #45) be

9  **DENIED**.

10      DATED this 30th day of September, 2015.

11

12

13                                    PEGGY A. LEEN
                                    UNITED STATES MAGISTRATE JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28