# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

BRYON QUACKENBUSH,

    Defendant.

Case No. 2:14-CR-00079-KJD-PAL

**ORDER**

    Before the Court for consideration is the Report and Recommendation (#57) of Magistrate Judge Peggy A. Leen, entered September 30, 2015, recommending that Defendant's Motion to Suppress (#45) be denied. Defendant timely filed an Objection to the Report and Recommendation on October 16, 2015 (#60), to which Plaintiff responded in opposition (#66). Defendant replied to Plaintiff's response in opposition on November 12, 2015 (#68).

**Background**

    The Defendant, Bryon Quackenbush ("Quackenbush") is charged in an indictment filed March 5, 2014, with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). The indictment arises out of a federal arrest warrant for Riley "Blake" Lively executed at an apartment on 3001 Lakes Dr., #220, in Las Vegas, Nevada on February 20, 2014. Quackenbush and his roommate, Lively, were in the apartment they shared at the time officers gained access. Lively was placed under immediate arrest. According to Defendant's Motion to Suppress, during the next two hours, federal agents questioned Quackenbush who made incriminating statements that he was attracted to children and had received child pornography from Robert Norwood consisting of pictures of Norwood's younger brothers' genitals and media of Norwood and his brothers engaged in oral sex. Quackenbush allegedly admitted that he and Norwood exchanged pictures and descriptions

of Norwood's sexual activities with his eight and eleven-year-old brothers and made other admissions prior to Miranda warnings.

Quackenbush seeks to suppress his statements arguing they were taken in violation of his rights under the Fifth and Fourteenth Amendment. Quackenbush maintains that he was subjected to custodial interrogation before Miranda warnings were administered. Additionally, he argues that the government cannot meet its burden of proving, by a preponderance of the evidence, that his statements were voluntary. According to Quackenbush, the circumstances of this case indicate that government conduct made it impossible for Quackenbush to make a rational choice about whether or not to confess. Quackenbush alleges he was in custody at the time he made his statements, the interrogation occurred inside his living room, and officers had focused their investigation on him. According to Quackenbush, all indicia of an arrest were present and the length and form of the questioning demonstrate he was subjected to custodial interrogation.

The government opposes the motion arguing Quackenbush was not subjected to custodial interrogation, and therefore, Miranda warnings were not required. The government's written opposition asserts that the agent who questioned Quackenbush "is believed to have erred on the side of caution and advised Quackenbush of the Miranda warnings." However, the government argues that, even if the Court finds Quackenbush was not advised of Miranda warnings, his incriminating statements are still admissible because he was not subjected to custodial interrogation as a matter of law, which means "express questioning or its functional equivalent." In this case, the government asserts that Quackenbush was only handcuffed for a few minutes and only as long as necessary to address safety during the execution of the arrest warrant for Lively.

After hearing testimony from both Quackenbush and Agent Bugni, the Magistrate concluded that Quackenbush was not handcuffed at the time of questioning. He was in his own home with only two officers in his immediate vicinity. He was aware of why the officers were present, told he was not under arrest, and did not have to speak with them. He was not tricked or coerced. Rather, the agents told Quackenbush about the warrant for his roommate's arrest, and advised him of the nature

of the investigation. Agents on the scene asked Quackenbush for consent to preview the computers searched and explained what they were looking for. According to the agents' reports, Quackenbush voluntarily offered information.

**Analysis**

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1) and LR IB 3-2.  The Court notes that Quackenbush's objection introduces a standard enumerating different factors than those employed by the Magistrate to support the conclusion reached in her Report and Recommendation.  This presents an issue of whether a party objecting to a magistrate judge's report and recommendation may raise in the district court, a legal argument that could have been, but was not, raised before the magistrate judge. This issue has been addressed by several circuit courts, the majority of which hold that because the Federal Magistrates Act exists to relieve the district courts of unnecessary work, "it would defeat this purpose if the district court was required to hear matters anew on issues never presented to the magistrate." Borden v. Secretary of Health & Human Servs., 836 F.2d 4 (1st Cir. 1987); see also Ridenour v. Boehringer Ingelheim Pharmaceuticals, Inc., 679 F.3d 1062 (8th Cir. 2012) (holding that the party objecting to a magistrate judge's Report & Recommendation waives its right to make a legal argument when it does not raise the argument before the magistrate judge); Paterson-Leitch Co. v. Massachusetts Municipal WholesaleElectric Co., 840 F.2d 985, 990-91 (1st Cir. 1988) ("an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.); Cupit v. Whitley, 28 F.3d 532, 535 & n.5 (5th Cir. 1994) (holding that a party waived a legal argument by failing to raise it before the magistrate judge); Madol v. Dan Nelson Auto. Group, 372 F.3d 997, 1000 (8th Cir. 2004); Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996) ("[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived").

The Ninth Circuit remains unclear on this matter.  In Farquhar v. Jones, 141 Fed. Appx. 539, 540 (9th Cir. 2005), the Court of Appeals held that the district court properly declined to address a

legal issue not raised before the magistrate judge, citing Greenhow v. Sec'y of Health & Human Servs., 863 F.2d 633, 638-39 (9th Cir. 1988), overruled on other grounds by United States v. Hardesty, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc). In Greenhow, the Ninth Circuit held that the district court had properly ruled that issues raised for the first time in objections to the magistrate judge's Report & Recommendation had been waived. In Bolar v. Blodgett, 29 F.3d 630 (Table of Decisions), 1994 WL 374194 (9th Cir. July 18, 1994) (unpublished decision), the Ninth Circuit held that:

> [A]lthough the district court had the discretion to consider Bolar's allegation raised for the first time in his October 22 objections, it did not abuse that discretion when it declined to consider the new claim. The purpose of the Magistrates Act would be frustrated if we were to require a district court to consider a claim presented for the first time after the party has fully litigated his claims before the magistrate judge and found they were unsuccessful.

Greenhow, Id. at *1.  Based on the aforementioned case law in the Ninth Circuit, this Court, in it's discretion, will address the merits of Defendant's objection.

In the Ninth Circuit, the issue of whether a defendant was subjected to custodial interrogation is a mixed question of law and fact which is reviewed *de novo*. United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).  In Kim, the Ninth Circuit set out five factors which help determine whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave. 292 F.3d at 973-74.  The factors are:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. Id.

The Magistrate relied on the factors enumerated in Kim for her analysis in the Report and Recommendation.  The Kim factor list was intended to be non-inclusive: "[these] factors are among those likely to be relevant […] other factors may also be pertinent to, and even dispositive of, the ultimate determination." Id.  As such, the Ninth Circuit left open the possibility that it could announce other relevant factors.

Judge Bybee, writing for the Ninth Circuit, took that opportunity to announce new relevant factors in <u>United States v. Craighead</u>, upon which Quackenbush relies in his objection, but did not argue to the Magistrate. 539 F.3d 1073, 1077 (9th Cir. 2008). Judge Bybee found that interrogations which occur inside the home (i.e. a "special place") present unique problems for determining the reasonableness of a belief that one was not free to leave.  He states:

> The home occupies a special place in the pantheon of constitutional rights. Under the First Amendment, the 'State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch.' The Second Amendment prohibits a federal 'ban on handgun possession in the home.' The Third Amendment forbids quartering soldiers 'in any house' in time of peace 'without the consent of the Owner.' The Fourth Amendment protects us against unreasonable searches or seizures in our 'persons, houses, papers, and effects.' The question presented in this case is one of first impression in our court: under what circumstances under the Fifth Amendment does an interrogation by law enforcement officers in the suspect's own home turn the home into such a police-dominated atmosphere that the interrogation becomes custodial in nature and requires Miranda warnings?

<u>Id.</u>, at 1077 (9th Cir. 2008) (internal citations omitted).

The Court noted that applying the usual standard (e.g. <u>Kim</u>) to "an interrogation conducted within the home presents some analytical challenges […] and presents an issue on which our court thus far has [previously] said little." <u>Id.</u>, at 1082.  Subsequent to <u>Craighead</u> at least one court has acknowledged that the <u>Craighead</u> factors are to be considered (where appropriate) in addition to the <u>Kim</u> factors: "<u>Craighead</u> identified several relevant factors […]. This list is not exhaustive.  In other custodial interrogation cases, the Ninth Circuit identified [the five <u>Kim</u> factors.]." <u>United States v. Salabye</u>, 623 F. Supp. 2d 1010, 1013 (D. Ariz. 2009). That court went on to apply both set of factors to the facts of that case.

The factors enumerated in <u>United States v. Craighead</u>, 539 F.3d 1073, 1084 (9th Cir. 2008) are:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

The <u>Craighead</u> case, while instructive, is factually distinguishable from the facts under which Quackenbush was questioned. In <u>Craighead</u>, the defendant was the target of a peer-to-peer investigation. The defendant in that case was in the military and living on base housing. A search warrant was issued, and FBI agents, along with local law enforcement, as well as personnel from the base, including defendant's superior officer were present. The FBI agents were wearing "raid vests," and had weapons unholstered in plain view, during the search of the residence. Craighead was taken into a storage room for questioning and was not allowed to leave.

Considering the first <u>Craighead</u> factor, in that case, eight law enforcement officers, representing different law enforcement agencies, entered Craighead's home. They were accompanied by two others, one of whom was Craighead's Air Force superior. All of the law enforcement personnel were armed, some wore protective gear, and some unholstered their firearms in Craighead's presence. The fact that the personnel represented three different law enforcement agencies was particularly relevant in that case as the presence of the different agencies led him to doubt whether the interrogating officer spoke for all agencies when she informed him that his statements were voluntary and that he was free to leave. The court concluded that a reasonable person in Craighead's position would feel that his home was dominated by law enforcement agents and that they had come prepared for confrontation. According to the <u>Craighead</u> court:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. In addition, if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force. In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere.

<u>Id.</u>, at 1084.

1    The environment in Craighead was far more coercive than that faced by Quackenbush. Here, Quackenbush was not the target of the investigation. Although several law enforcement officers did initially appear on the scene in connection with executing an arrest warrant of Riley Lively, Quackenbush's roommate, following the arrest, only three to four of the initial officers remained during Quackenbush's questioning. These officers wore plain clothes and had their weapons holstered. The officers took a low-key approach to entry into the residence and during the arrest of Lively as they did not want to attract unwanted attention from neighbors in the apartment complex where Quackenbush and Lively resided. Although Quackenbush was initially handcuffed during the arrest of Lively, the handcuffs were removed once the residence was secured and officers were able to insure no other persons were present in the home -- a process that testifying Agent Bugni estimated took no more than three to five minutes.

Considering the second Craighead factor, although Craighead was not handcuffed or physically restrained, he was escorted to a back storage room and the door was closed behind him. A detective was leaning against the door in such a way to block Craighead's exit from the room. This detective wore a raid vest and was visibly armed. The detective remained silent and faced Craighead throughout the duration of the interrogation. According to the Court, when law enforcement agents "restrain the ability of the suspect to move—particularly through physical restraints, but also through threats or intimidation—a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation." Id., at 1085.

Here, Quackenbush was not taken into a closed room, rather, Agent Bugni and Quackenbush sat in the dining room of the apartment in full view of the open door. Agent Bugni indicated during his testimony before the Magistrate that only one other agent was in the room with him, while one agent remained outside the apartment in an alcove outside the door to insure that no one entered the apartment without the officer's knowledge. It is not clear whether Quackenbush could see the third agent. The interrogating agent sat on a milk crate next to Quackenbush who was sitting in an office chair.

Considering the third Craighead factor, whether suspect was isolated from others, according to Plaintiff, Quackenbush was not taken into a closed room. He and Agent Bugni were in the dining room of the apartment, which was in full view of the open door. Only one other agent was in the room with Bugni and the other was located outside of the apartment in an alcove outside the door to ensure that no one entered the apartment without the officer's knowledge. Quackenbush was, however, the only non-law enforcement person present during his interrogation. The Supreme Court highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements. Miranda v. Arizona, 384 U.S. 436, 445-6 (1966). This fact thus weighs in favor of finding that Quackenbush was in custody. \

Considering the last Craighead factor, Quackenbush was informed that he was free to leave. The Ninth Circuit has consistently held that perhaps the most significant factor for the court to consider in resolving the question of custody is whether the defendant was expressly told that he was not under arrest and free to leave. See United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2003); United States v. Norris, 428, F.3d 907, 912 (9th Cir. 2005). Quackenbush admits he was.

Under the totality of the circumstances, the Court finds that the Magistrate Judge correctly concluded that Quackenbush was not subjected to custodial interrogation. As a result, Miranda warnings were not required. The Court also finds that the Magistrate correctly concluded that the government met its burden of establishing that Quackenbush's statements were in fact, voluntary.

///

**Conclusion**

Accordingly, the Court determines that the Report and Recommendation (#57) of the United States Magistrate Judge entered September 3, 2015, should be **ADOPTED** and **AFFIRMED.**

**IT IS THEREFORE ORDERED** that the Magistrate Judge's Report and Recommendation (#57) entered September 3, 2015, are **ADOPTED** and **AFFIRMED;**

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress (#45) is **DENIED**.

DATED this 28th day of January 2016.

Kent J. Dawson
United States District Judge